**NON-CONFIDENTIAL VERSION**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

|  |  |  |
|---|---|---|
| E.I. DuPont de Nemours & Co. | ) | |
| | ) | |
| Plaintiff, | ) | Court No. 15-00005 |
| v. | ) | |
| | ) | |
| United States, | ) | |
| Defendant. | ) | |
| | ) | |

**COMPLAINT**

1. Plaintiff, E.I. DuPont de Nemours & Company ("DuPont"), commences this action pursuant to 19 U.S.C. §§ 1516a(a)(2)(A)(i)(I) and (a)(2)(B)(ii), to contest the United States International Trade Commission's ("ITC" or "the Commission") final determination of no material injury or threat of material injury from unfairly traded imports of 1,1,1,2 tetrafluoroethane ("R134a") from China. The determinations were published in the *Federal Register* on December 9, 2014. *See 1,1,1,2-Tetraflouroethane from China*, 79 Fed. Reg. 73,102 (Int. Trade Commission Dec 9, 2014) (final det.) ("*Final Determination*"). The determinations and the views of the Commission are contained in *1,1,1,2-Tetraflouroethane from China*, Inv. Nos. 701-TA-509 and 731-TA-1244 (Final), USITC Pub. 4503 (Dec. 2014) ("ITC Final").

**JURISDICTION**

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c), which confers upon the Court the exclusive jurisdiction over civil actions commenced pursuant to 19 U.S.C. § 1516(a).

BUSINESS PROPRIETARY INFORMATION SUBJECT TO
PROTECTIVE ORDER HAS BEEN DELETED FROM BRACKETS

3.  On January 7, 2015, DuPont timely filed a Summons with this court within 30 days of the publication of the *Final Determination*. This Complaint is being filed within thirty days of the filing of the Summons and therefore is timely in accordance with 28 U.S.C. § 2636(c) and within the time limits specified in USCIT Rule 3(a)(2).

## STANDING

4.  DuPont is a domestic producer of R134a and therefore an interested party as defined in 19 U.S.C. § 1677(9)(C). In addition, DuPont participated actively in the Commission proceeding that resulted in the contested determination, and is therefore entitled to commence this action pursuant to 19 U.S.C. § 1516a(d), and 28 U.S.C. § 2631(c).

## PROCEDURAL HISTORY

5.  On October 22, 2013, Mexichem Fluor Inc. filed an antidumping and countervailing duty petition with the U.S. Department of Commerce ("Commerce") and the Commission alleging that producers and exporters in China were receiving countervailable subsidies, that they were selling subject merchandise in the United States at less than fair value, and that imports from these producers and exporters were materially injuring, or threatening with material injury, the U.S. industry.

6.  On October 28, 2013, the Commission published a notice of institution of its material injury investigations. *See 1,1,1,2-Tetraflouroethane from China*, 78 Fed. Reg. 64,243 (Int. Trade Commission Oct. 28, 2013) (notice of institution). On December 9, 2013, Commerce published notices of its initiation. *See 1,1,1,2-Tetraflouroethane from China*, 78 Fed. Reg. 73,832 (Dep't of Commerce Dec. 9, 2013) (notice of initiation) and *1,1,1,2-Tetraflouroethane from China*, 78 Fed. Reg. 73,839 (Dep't of Commerce Dec. 9,

BUSINESS PROPRIETARY INFORMATION SUBJECT TO
PROTECTIVE ORDER HAS BEEN DELETED FROM BRACKETS

2013) (notice of initiation). DuPont entered an appearance as an interested party before the ITC and in the antidumping investigation before Commerce on November 4, 2013, and November 6, 2013, respectively. DuPont took no position with respect to the countervailing duty petition and did not enter an appearance before Commerce in the countervailing duty investigation.

7.   On December 27, 2013, in its preliminary determination, the Commission unanimously found that there was a reasonable indication that an industry in the United States was materially injured by reason of imports of R134a from China. *See 1,1,1,2-Tetraflouroethane from China*, Inv. Nos. 701-TA-509 and 731-TA-1244 (Preliminary), USITC Pub. 4444 (Dec. 2013).

8.   On October 20, 2014, Commerce published final affirmative antidumping and countervailing duty determinations. *See 1,1,1,2-Tetraflouroethane from China*, 79 Fed. Reg. 62,594 (Dep't of Commerce Oct. 20, 2014) (fin. det.) and *1,1,1,2-Tetraflouroethane from China; Final Determination of Sales at Less Than Fair Value*, 79 Fed. Reg. 62,597 (Dep't of Commerce Oct. 20, 2014) (fin. det.).

9.   On December 9, 2014, the Commission published its *Final Determination* that the domestic R134a industry was neither materially injured nor threatened to be materially injured by reason of imports from China. Four Commissioners voted in the negative and two Commissioners voted in the affirmative.

10.   During the investigation, the data relied upon by the Commission demonstrated that domestic producer prices, the value of the domestic industry commercial sales, and the domestic industry's operating income all fell steadily over the period of investigation. By January-June, 2014, *i.e.*, the last six months of the

BUSINESS PROPRIETARY INFORMATION SUBJECT TO
PROTECTIVE ORDER HAS BEEN DELETED FROM BRACKETS

Commission's period of investigation, the domestic industry's operating income [

]. ITC Final at 23, n.148; ITC Confidential Final at 35, n.148.

11.     The data collected by the Commission also demonstrated that subject imports from China [                                    ] of the U.S. market in 2011 to [         ] in 2012 before [

] in 2013, and that commercial shipments of Chinese imports [

]. ITC Final at 16; ITC Confidential Final at 23.

12.     The four Commissioners voting in the negative found "the volume of subject imports to be significant in absolute terms and relative to consumption." ITC Final at 17.  They also found that the pendency of the investigations affected the import volume in the first half of 2014, so that they accorded less weight to the first half 2014 data. *Id.* at 15, n.90.  And they found that sales with a value of [

]. *Id.* at 36; Confidential Dissent at 8.

13.     Nevertheless, the four Commissioners voting in the negative concluded that volume effects of the subject imports on the domestic industry were not significant because the imports had been drawn into the U.S. market by a supply shortage in 2011, that ended in 2012.  They stated that "this increase in market share was a function of purchasers' response to the supply shortages that persisted through at least the end of 2011.  Thus, the supply situation of the domestic industry, rather than underselling by subject imports, explains the shifts in market share."  ITC Final at 18.  They did not explain why imports of R134a increased their share of the U.S. market after the "supply

situation of the domestic industry" had eased.  The two dissenting Commissioners pointed out that "the parties agreed that supply tightness was no longer a real issue after 2011." *Id.* at 33.

14.     The Commission collected volume and value data from domestic producers and importers of Chinese R134a on shipments by market segments.  Those data demonstrated that (1) imports from China were heavily concentrated in the two largest segments of the U.S. market, *i.e.*, the auto aftermarket and the market for "other" applications, (2) the domestic industry's share of the auto aftermarket fell from [

], and (3) because of the share it lost in the auto aftermarket segment, the domestic industry's share of shipments to market as a whole [

].  ITC Final at 31-32; Confidential Dissent at 2.  The majority, however, discounted the significant fall in market prices in the segments of the market where imports from China were present.  The majority reasoned that the large price declines in the products facing direct competition with imports were a result of the automotive aftermarket being more affected than other segments by the tight supply at the beginning of the POI.  ITC Final at 19.

15.     With regard to underselling, the Commission collected data by domestic producers and importers from seven specific types of sales.  Product 1 was "R-134a {sold} in bulk to distributors."  Product 2 was "R-134a {sold} in bulk to retailers."  Because large distributors and retailers that purchase in bulk from the domestic industry also import directly, DuPont asked the Commission to collect data on prices paid by distributors and retailers for their direct imports, as such distributors and retailers chose between direct imports and domestic supply.  *See* Comments on ITC Draft

BUSINESS PROPRIETARY INFORMATION SUBJECT TO
PROTECTIVE ORDER HAS BEEN DELETED FROM BRACKETS

Questionnaires by DuPont (July 1, 2014) at 3. The Commission did not collect the requested data.

16. The quarterly pricing data that the Commission did collect showed 31 instances of "underselling" compared to 35 instances of "overselling." ITC Final at 18. However, the instances of overselling involved [    ] volumes of imports. By volume, [    ] percent of the period of investigation imports "undersold" the comparable domestic like product sold in the same quarter. *Id.*; Confidential Dissent at 4. The four Commissioners voting in the negative characterized the "instances of underselling and overselling by subject imports" as "mixed." ITC Final at 18.

17. While the four Commissioners voting in the negative acknowledged that the domestic industry's prices declined over the POI, they found that the "record shows that prices at the beginning of the POI were at high levels due to the supply squeeze that began in 2010. Prices peaked in 2011. As the supply situation normalized in 2012, prices declined." ITC Final at 18-19. They therefore concluded that "the decline in prices during the POI is associated with the cessation of the supply shortage that temporarily inflated prices." *Id*.

18. The record shows, and the two dissenting Commissioners pointed out, that prices continued to decline in 2013 and the first half of 2014, well after the cessation of supply shortage in 2011. ITC Final at 33. The four Commissioners voting in the negative did not mention the continuation of the price declines past 2012. Rather, they stated that the market "stabilized in 2012 and 2013." *Id*. at 24. However, the four Commissioners voting in the negative did not explain the reasoning behind their

6

conclusion that a decline in U.S. producer prices [            ] could rationally be interpreted as a "normalized situation."

19. The four Commissioners voting in the negative noted that the ratio of cost of goods sold ("COGS") to net sales increased from 2011 to 2013, but found that "this increase in the COGS to net sales ratio is attributable primarily to changes in net sales value, which decreased from $[        ] in 2011 to $[        ] in 2012 and then to $[        ] in 2013." ITC Final at 19-20; ITC Confidential Final at 30. They concluded "that the increase in the COGS/net sales ratio is a function of the high price levels that existed at the beginning of the POI due to supply shortages -- and the subsequent alleviation of those shortages -- rather than the presence of subject imports." *Id.* at 20. They did not explain how a fall in prices [            ] could reasonably be attributed to the "alleviation of shortages."

20. The four Commissioners voting in the negative also found that there was no threat of material injury by reason of R134a imports from China. ITC Final at 24-28. However, the record evidence established that subject imports [            ] from 2011 to 2013. The record further established that Chinese capacity was vast and significantly unused, and that imports of subject merchandise from China undersold U.S. producers' prices and captured additional market share.

21. Notwithstanding this evidence, the two Commissioners voting in the affirmative found that there was present material injury, and therefore did not address the issue of threat of material injury. ITC Final at 31-42.

BUSINESS PROPRIETARY INFORMATION SUBJECT TO
PROTECTIVE ORDER HAS BEEN DELETED FROM BRACKETS

## STATEMENT OF CLAIMS

**First Count:**          **Volume Effects of Subject Imports from China**

22. Paragraphs 1-21 are hereby incorporated by reference.

23. The majority's findings regarding the volume effects of subject imports on the domestic industry were not supported by substantial evidence and were not in accordance with law. Specifically, the majority's failure to take into account the period of investigation rise in, and market share gains associated with, shipments of subject imports is reversible error.

24. The majority concluded that, despite the significant overall rise in the volume of imports between 2011 and 2013, the slight drop toward the end of that period disproved Petitioner's and DuPont's contention that there were volume effects on the domestic industry. This conclusion is not supported by substantial evidence and is not in accordance with law because 1) the "slight" 2012 -2013 drop in the volume of the imports did not materially reduce their market share or their significant market share gains over the POI, and 2) the conclusion fails to factor into the analysis the significant rise in shipments of subject imports in each year of the POI.

25. Moreover, the Commission's finding that the increase in market share by imports of R134a from China between 2011 and 2012 "was a function of purchasers' response to the supply shortages that persisted through at least the end of 2011" was not supported by substantial evidence because the supply shortage ended in 2011 and the imports remained at a level the Commission acknowledged to be "significant."

26.     Similarly, the majority impermissibly dismissed as immaterial, without explanation, the volume effects of [            ] in R134a sales and [            ] in R134a revenues lost to subject imports.

27.     For these and other reasons that can be found in the public and confidential administrative record to be filed with the Court, the majority's conclusion regarded the volume effects on the domestic industry and the threat of material injury posed by such volume effects is not supported by substantial evidence on the record and is not in accordance with law.

**Second Count:        Market Segment Analysis**

28.     Paragraphs 1-27 are hereby incorporated by reference.

29.     The Commission's market segment analysis is not supported by substantial evidence and is not in accordance with law.  The evidence collected by the Commission demonstrates that the market for R134a is segmented.  DuPont argued to the Commission that the significantly greater declines in U.S. industry shipments, revenues, and market share prices in the two largest segments of the market where imports from China were a significant factor was evidence of material injury by reason of subject imports to the domestic industry as a whole. The two dissenting Commissioners agreed, but the majority failed to address the issue. The majority's failure to do so is reversible error as it is not in accordance with the Commission's obligation to address an issue raised by a party that was material to its analysis.

30.     For these and other reasons that can be found in the public and confidential administrative record to be filed with the Court, the majority's market

BUSINESS PROPRIETARY INFORMATION SUBJECT TO
PROTECTIVE ORDER HAS BEEN DELETED FROM BRACKETS

segment analysis is not supported by substantial evidence and is not in accordance with law.

**Third Count:       Price Effects of Subject Imports from China**

31.   Paragraphs 1-30 are hereby incorporated by reference.

32.   The majority's analysis of the price effects of the subject imports is not supported by substantial evidence and is not in accordance with law. The Commission's finding that "the decline in prices during the POI is associated with the cessation of the supply shortage that temporally inflated prices" is unsupported by substantial evidence because the data relied on by the Commission demonstrated that prices continued to fall through the second half of 2012 and 2013, *i.e.*, long after the Commission acknowledged that the supply shortage had ended.

33.   Similarly, the Commission's finding that "{a}s the supply situation normalized in 2012 prices declined" is unsupported by substantial evidence because prices declined throughout 2012 and 2013, and by 2014, had dropped to a level [


    ]. There is no rational explanation for the Commission's finding that a "normalized supply situation" exists when the domestic industry is [

   ].

34.   Also, the Commission's finding "that the increase in the COGS/net sales ratio is a function of the high price levels that existed at the beginning of the POI due to supply shortages -- and the subsequent alleviation of those shortages -- rather than the presence of subject imports" was not supported by substantial evidence. The record of the investigation shows that prices [                                                    ].

35. Finally, the Commission's finding that the market "stabilized in 2012 and 2013" was not supported by substantial evidence because market prices fell, and the domestic industry's operating results deteriorated, throughout the period of investigation.

36. For these and other reasons that can be found in the public and confidential administrative record to be filed with the Court, the majority's conclusion that the domestic industry is not materially injured by the price effects of the subject imports is not supported by substantial evidence and is not in accordance with law.

**Fourth Count:**   **Collection of Pricing Data**

37. Paragraphs 1-36 are hereby incorporated by reference.

38. The Commission's refusal to collect certain pricing data is not in accordance with law.  The Commission rejected without explanation DuPont's request to collect data on prices paid by distributors and retailers for their direct imports.  As a matter of law, the Commission is required to explain its rationale for refusing to collect information requested by a party to the investigation that the party considered critical to the Commission's analysis.  The Commission ignored DuPont's request.  As a result, its analysis of underselling by subject imports was based on a set of data that was unlawfully incomplete and distorted.

**Fifth Count:**   **Lost Sales and Lost Revenue**

39. Paragraphs 1-38 are hereby incorporated by reference.

40. The majority's analysis of lost sales and lost revenue is not supported by substantial evidence.  The majority discounted evidence of significant sales and revenue that the domestic industry lost to imports of R134a from China. The record shows that the domestic industry had significant levels of lost sales and lost revenue as a direct result of

BUSINESS PROPRIETARY INFORMATION SUBJECT TO
PROTECTIVE ORDER HAS BEEN DELETED FROM BRACKETS

the low-priced subject imports and, therefore, the majority's conclusion that the domestic industry was not materially injured by the subject imports is not supported by substantial evidence on the record.

**Sixth Count:     Material Injury**

41.   Paragraphs 1-40 are hereby incorporated by reference.

42.   For the detailed reasons set in counts 1 – 5 above, and for other reasons that can be found in the public and confidential administrative record to be filed with the Court, the majority's analysis of whether unfairly traded imports of R134a from China were a cause of material injury to the domestic R134a industry is not in accordance with law and is not supported by substantial evidence

**Seventh Count:     Threat of Injury by Imports from China**

43.   Paragraphs 1-42 are hereby incorporated by reference.

44.   The majority's determination that there was no threat of material injury is not supported by substantial evidence in light of the data demonstrating that subject imports [              ] from 2011 to 2013, that there exists significant unused Chinese capacity, and that imports of subject merchandise from China undersold U.S. producers' prices and captured additional market share.

45.   For the reasons set forth above, and for other reasons that can be found in the public and confidential administrative record to be filed with the Court, the majority's conclusion that domestic R134a is not threatened with material injury by reason of the subject imports from China is not supported by substantial evidence on the record and otherwise is not in accordance with the law.

BUSINESS PROPRIETARY INFORMATION SUBJECT TO
PROTECTIVE ORDER HAS BEEN DELETED FROM BRACKETS

## DEMAND FOR JUDGMENT AND RELIEF

46. WHEREFORE, Plaintiffs respectfully request that this Court:

47. Hold that the negative determination reached by the Commission with respect to subject imports from China in the *Final Determination* is unsupported by substantial evidence and is otherwise not in accordance with law;

48. Remand this matter to the Commission with instructions that it must collect pricing data on prices paid by distributors and retailers for their direct imports and that it must reconsider its *Final Determination* in light of these data and as set forth above; and

49. Grant such further relief that this Court may deem just and appropriate.

Respectfully submitted,

/s/John D. Greenwald
John D. Greenwald
James R. Cannon, Jr.
Jonathan M. Zielinski
Friederike Görgens*
CASSIDY LEVY KENT (USA) LLP
2000 Pennsylvania Avenue, N.W.
Washington, DC 20005
(202) 567-2318

February 5, 2015

*On Behalf of E.I. DuPont de Nemours & Company*

*Admitted in Massachusetts and New York; acting under the supervision of the principals of the firm admitted in the District of Columbia.